Good morning, Your Honors. My name is Tekla Hanson-Young, and I represent the Forest Service. With me is Mr. Owen Maroney, who represents the State of Idaho. We plan to split our time 14-6, and I will reserve 4 minutes for rebuttal. This is an extraordinary case in which the destruction of scientific information that was obtained using valid methods of monitoring wildlife. The district court entered this injunction without jurisdiction, because the plaintiffs lacked standing to seek this type of injunctive relief, and because the case was moot. Even assuming that the district court had jurisdiction, however, the injunction was a gross abuse of discretion that should be vacated. You're claiming that the plaintiff in this case has no standing to stop the use by Idaho of the data which was gotten as to the wolves and elks, right? That's correct. Why is that? The claim is that that data would change the ability of the plaintiffs to enjoy a natural resource because it would lead to the elimination of wolves. That harm is too speculative to support standing. The plaintiffs provided no proof that Idaho would use this wolf data to engage in wolf control operations. Well, then if they're not going to use the information, you've got nothing to lose. Why object to it? Once the information has been obtained, it could provide the state with valuable information about wolf control. Because Idaho would use it and track the wolves and kill the wolves. Well, I think the state could better address how it would use the wolf monitoring data, but my understanding is that it could show indications about the wolf population itself, and that in any event, as a practical matter, none of the radio callers are operational, so they couldn't be used at this moment. But the reason why the Forest Service is concerned and has appealed the wolf data issue in addition to the elk data issue is because the principles of standing and mootness apply equally to both. No, they don't. They don't. Can we back up? There's two different orders. Right. What about the 90-day order? You represent the Forest Service, right? Yes. Are you going to talk about the 90-day delay? Yes, I was hoping to talk about that. I'm happy to talk about that now. I mean, I just want to keep things straight, and for a minute there, I thought you represent Idaho, so I was literally getting confused about what your argument is. Can we back up? Are you objecting to both? Both components of the injunction? Yes. So why would you think that they don't have a standing to object to the 90-day delay? They don't have standing to request a 90-day delay. First of all, they never even requested that in the District Court. The District Court, sua sponte, ordered the Forest Service to delay the implementation of any subsequent helicopter permits by 90 days. I understand that. But even if they had tried to show standing, they wouldn't be able to do so because they were— They're harm. They're harm. I just want to—I don't want to take too much of your time, but their argument is that, look, there's a NEPA violation. The District Court found the cumulative effects requirement was circumvented. We have a right to have—that's all NEPA gives us is a process, and we have a right to get into court to challenge this next time. What about that? If you could just cut to that chase, that would be helpful to me. That would provide plaintiffs with the ability to obtain this kind of injunctive relief in nearly every APA permitting decision. And the plaintiffs— Not every APA permitting decision where a permit is issued effective immediately and then it's over with by Sunday morning. There's a lot of permits that would meet these kinds of situations. For example, wild horse gathers. There's frequent weather constraints that require the agency to engage in those operations immediately. And I would also add here, just stepping away from the threshold reasons why this court should vacate the 90-day delay and getting to the merits of why that injunction was improperly entered, there—as an initial matter, the injunction itself wouldn't necessarily remedy the harm that the plaintiffs—that the District Court was trying to remedy here in that it doesn't—the injunction doesn't require the plaintiffs to file suit immediately once the injunction is issued. In other words, the plaintiffs are still free to wait the 90 days and then wait until the helicopter permit would be— That would be their problem. He's not guaranteeing any outcome. He's not guaranteeing that they're going to win. It's just a question of trying to get to a place where this is a long-standing dispute. And he made careful findings about the extent to which the parties aren't litigating the real issue. And he made a comment to the effect of, I'm not telling you how to litigate your case, but it seems to me you're circumventing the real issue here, which is the extent to which Idaho can conduct these operations in a wilderness area. So what's wrong with saying there's going to be a 90-day delay so we can really get to it? Well, respectfully, Your Honor, I—the District Court didn't make those findings, but— Well, he certainly went on and on on the record about—to that effect. I read the transcript carefully. Yes. And in the transcript, the District Court was specifically discussing the argument that Idaho pressed that it didn't need Forest Service authorization to land helicopters in wilderness. Idaho has not pressed that issue on appeal, and the Forest Service position is that Idaho does need to apply for a permit to land helicopters in wilderness. This is only the second permit—helicopter permit—that the Forest Service has issued to Idaho to land helicopters in wilderness. The District Court is so much closer to this long-standing dispute than we are. And the fact that Idaho is taking the position that it could have done all of this without even asking for a permit did not put the District Court in a position where he was confident about this going forward in a way that was consistent with the law. You know, that only hurts your argument, right? That's why he was concerned about getting everybody into court, taking a deep breath, and allowing the issue to be decided on its merits. And none of the parties are arguing on appeal that Idaho does not need to apply for another or any helicopter permits in the future, should it apply. Has Idaho withdrawn that argument? Idaho has not pressed that argument on appeal. Well, Idaho can talk about that when Idaho comes to the microphone, I suppose. But I certainly read it in the briefing. The Forest Service's position is that Idaho needs a permit to land helicopters in wilderness, period. Okay. There are other reasons why the 90-day delay order is inappropriate. First of all, it violates the Supreme Court's instruction in Vermont Yankee that courts should not graft their own administrative procedures. That's a better point. The other reason is that even if the district court, even if it was appropriate to enter this kind of relief, the district court didn't consider the four-factor test set out in Monsanto. And then the third reason is that if, to the extent the district court was trying to punish or punish the Forest Service or order it to comply with its 2010 wolf recovery order, it didn't follow the requirements for any kind of contempt proceeding. It's not a contempt order. I certainly grant you that. Could you back up and talk about why you think he didn't have the latitude under the circumstances here and given the history to order the 90-day delay? Sure. I grant you that courts have broad equitable discretion to fashion equitable relief. But the court does not have the ability to impose procedural rules on federal agencies that are not required by statute, as the district court did here. And there's helpful precedent on this issue in Wilderness Watch v. Allen, which is discussed in our briefs, the McNair case, and also in Vermont Yankee and those other cases, which make clear that broad principles of administrative law direct that courts refrain from imposing these types of procedures on federal agencies. Do any of those cases involve the kind of history here comparable to the 2010 order that the judge issued? No, none of them do. But what I would add is that as a practical matter and what the Forest Service did here was provide ample notice to Wilderness Watch that it was going to issue the permit. I grant you that once the permit was issued, Wilderness Watch did not have a lot of time to come in and request an injunction. But Wilderness Watch knew by mid-October that it had 45 days to object to the issuance of the permit. It objected at the end of November, and the Forest Service denied that objection at the end of December, and once the Forest Service denied that objection, that paved the way for the Forest Service to issue the permit. The permit decision itself disclosed that helicopter landings would have to occur by January 15th, so Wilderness Watch was on notice that landings would occur very quickly. Okay, and so this is helpful. When did they get that notice, please? On December 29th, the Forest Service denied the objection. So at that point, the Forest Service could have issued the permit at any day. On January 4th, the trial counsel for the Forest Service notified the plaintiffs that the permit would be issued shortly. Isn't that the first day they can really file? The permit was issued on January 6th, so that would have been the first day that they could have filed. They filed suit on the 7th, but they didn't move for a TRO at that point, which they could have. Their declarations were dated January 6th and 7th, so their declarations were ready, and it wouldn't have taken a lot to have filed a TRO, particularly when they had filed the complaint. They chose not to do that as a matter of litigation strategy. What the Forest Service did in this case was provide ample notice within its procedural abilities to the plaintiffs so that they could file suit. The administrative record was ready, and review could have been had, and the controversy could have stayed if Wilderness Watch had moved for a temporary restraining order. I don't know how I'm baffled by your statement that they didn't file a TRO within 24 hours as a matter of litigation strategy. How do I see that here? There's letters in the record. I don't have the sites. I can try to find them, but there's letters in the record from the plaintiffs' counsel to the Forest Service asking the Forest to delay the implementation. I believe Mr. Press has submitted a declaration in the district court talking about the history of that, and he can perhaps address this. But it's 24 hours. They filed a complaint within 24 hours. How is the Forest Service in a position to attribute litigation strategy or that they're somehow playing games? We're not. It was perhaps a valid choice, but the fact is they haven't provided a reason why they couldn't have filed a TRO. Okay. And that could have preserved the issues, assuming the district court would have granted the TRO. You have to file it Friday and get the TRO Friday to have stopped anything, right? That's fair. I would also add, although you have mentioned that there's a long-standing history of litigation, I don't think that that's true. There was one lawsuit in 2010 concerning a different helicopter permit that the Forest issued under a categorical exclusion, which is quite different from what the agency did here. I meant to reference the long-standing dispute. If I said litigation, I misspoke. Sure. And that, I think there is long-standing disagreement about the use of helicopters in wilderness. But I would also add that in this litigation, Wilderness Watch hasn't challenged a policy on the Forest Service's part of issuing permits without conducting an EIS or without preparing an EIA. They haven't alleged any kind of policy or practice of doing those sorts of things. This challenge was to one helicopter permit that authorized discrete helicopter landings. It didn't authorize the collection of data. It doesn't govern that, and the remedy is completely divorced from the harms that flowed from the actual permit. Without the helicopter landing, they couldn't have put the tags on the wolves. So the helicopter landing was a but-for-cause for the wolves being tagged, right? They actually could have put the radio collars on the wolves if they had gone in by foot, for example. But they didn't. But they didn't. And can you go back to that? Because there's a fleeting reference in the transcript to the fact that the Forest Service did not authorize any of those other collars. This was just helicopter landing, right? That's all the permit was granted for. The permit was simply to, yes, that's correct. Then there's this for additional animals, wolves that were collared. And I understand the Forest Service issued a notice of noncompliance, but I don't know what that means or what happens. Sure. Once the Forest Service became aware that Idaho placed collars on wolves, the Forest Service issued the notice of noncompliance, which said you didn't comply with the terms of your permit. The permit was only to land helicopters, which were to place radio collars on elk, and you must investigate why this occurred, provide us with information about why this occurred, and if you apply in the future for another helicopter permit, you have to ensure that steps are taken to make sure this kind of violation or noncompliance won't happen again. So it wasn't entirely toothless. I see I've gone well over what I'm – It wasn't entirely toothless because they had to investigate? They had to investigate and ensure that if they applied for another permit in the future, they would have measures in place to make sure the violation wouldn't happen again. Thank you. Thank you. I will reserve the rest of my time for rebuttal. Good afternoon. May it please the Court, my name is Owen Rowney and I represent the Director of— Pardon me, Madam Clerk, I don't think that you're there yet. That's good. Good afternoon. May it please the Court, my name is Owen Rowney and I represent the Director of the Idaho Department of Fish and Game. The Director's Appeal addresses the District Court's decision to issue extraordinary and unprecedented data destruction relief— Counsel, would you kindly slow down and speak more directly into the microphone? I'm having difficulty hearing what you're saying. The Director's Appeal addresses the District Court's decision to issue— extraordinary and unprecedented data destruction relief penalizing the State of Idaho for a past Forest Service decision and bygone State action. The relief issued in this case violates the 11th Amendment, which prohibits citizen suits in the absence of State consent. The relief simply cannot fall under the Ex parte Young Doctrine because there is no ongoing violation of Federal law. Well, if—pardon me, Counsel, if the Director uses the data regarding the wolves, right, the wolves will be killed. And isn't that an ongoing harm under Ex parte Young? I mean, with the wolves being killed, the plaintiffs can't watch the natural reserve with the amount of wolves that were there before. That seems like an ongoing harm. Does it not? So the State—the Federal Government doesn't permit the State to have possession and use wildlife data. It merely permitted the helicopter landing, putting helicopter skids on the ground. And the helicopter landing was a but-for cause of the collection of the animal data. Was it not? It was. It would be an extraordinary remedy because if you think about this in the context of every Federal permit that's issued in highways or anything, a similar remedy would be requiring the State— How do you achieve restitution for an improper landing for wolf-collaring purposes without limiting the use of the wolf data? Because that might be preventive to a further action of the State. I would point out, though, at the same time, the bulk of the work were the 60 elk that were collared, and we had a valid permit for those. It said we could begin immediately, and we did begin immediately. Does the injunction stop you from using the elk data? Yes, it requires the destruction of the elk data and prohibits the State from using the elk data in any manner. So, but that's a different provision of the injunction from the destruction of the wolf data. It just—the injunction just wholesalely requires the destruction and prohibits the use of wolf. And to take a second to be clear on the facts of the wolves. Four wolves were collared due to an employee mistake. The mistake was, frankly, embarrassing to the agency. The agency self-reported the mistake, and the Forest Service issued a notice of noncompliance. Enforcement of this permit violation was left to the discretion of the Forest Service, and there simply is no— If it's embarrassing to Idaho, why doesn't Idaho go ahead and destroy the data? Because from Idaho's perspective, from the biologist's perspective, it's still valid data, and there's no reason to just get rid of it. Except the embarrassment that you shouldn't have done it. Yes. And one other thing I want to point out with the wolf data is the collars were not placed. The reason why Fish and Game was placing collars on a lot of wolves at this time was we were— wolves had been listed within the last five years. We're still in the post-delisting monitoring period, so we had an obligation to account for the number of wolves in Idaho and make sure that they didn't drop below a certain level. So collaring wolves and then locating them several times during the winter was the primary methodology for tracking wolves. And so the mistake was really when crews would go out and fly around, they would opportunistically collar wolves outside the Forest Service where it wasn't permitted. And this crew leader just merely took that— his practices from outside the wilderness into the wilderness in this case. Additionally, I'd like to address how the 11th Amendment should apply because of the unique nature of the remedy mandating the destruction of state property. Courts have discussed the 11th Amendment prohibition on the adjudication of state property interests without state consent. Although narrow, this reasoning should apply to the unique facts of this unprecedented case due to the significant state sovereign interest in wildlife management and the great hazard and cost involved in collecting this data. In the alternative, the district court abused its discretion by issuing an overly broad injunction. Due to principles of federalism, the scope of federal injunctive relief against the state must be narrowly tailored to enforce federal law only. The district court— What was so broad about the injunction? Requiring the destruction of a data period, The district court didn't just issue an injunction saying the timing or anything like that. How can one prevent the use of the data without destroying it? The state's position would be that federal law doesn't even govern a state's possession and use of data. It did govern us putting a helicopter on the ground in the wilderness, and the state, despite any posturing in the past or whatever, it went ahead and got a permit. But there was posturing. That's part of the problem for the district court. He's trying to figure out that this isn't a situation where people are getting out ahead of that. That's what NEPA is. And there's that one email in the record where a Forest Service employee represents some posturing, but the bottom line fact is— Forgive me. Wasn't the position taken, and I'm not asking you to endorse it, but wasn't the position taken by EIDL that they didn't need a permit to do this? It was taken below. I'm not taking that position on appeal. I appreciate that, but the answer is yes, right? That's what the district court—again, we're trying to review the district court's decision, and he had that in the record, didn't he? He did. Okay. All right. But back to Judge Baez's question. The injunction, your position is at least it was too broad, and you would suggest it should have been what, please? That it shouldn't have required total destruction of the data. It could have enjoined the Forest Service looking at the data in the future, but reaching into the state's private action of just possessing, merely possessing wildlife data was overly broad. So it only should have aimed at the Forest Service? Is that your position? I don't want to speculate on what the judge could have done for an injunction, but I'm just—as far as the state's sovereign interest, I would say it was too broad in requiring the state to destroy wildlife. Okay. What would be an adequately narrow injunction in your view with respect to the data? Would it be filed and not looked at? I guess— I mean, it's all very nice and well to say a generality is too broad, but when you're asked the question of what would not be too broad, tell me, counsel, what would not be too broad? Something prohibiting the Forest Service looking at it in the future, maybe something requiring— In other words, keep it in the Idaho files and not let the U.S. Forest Service see it. Requiring the Forest Service to prepare an EIS before they looked at the injunction, something like that. Not requiring a sovereign state to completely destroy the data. And I see I've gone over my time, so in conclusion, the director asked this court to dismiss for lack of jurisdiction or alternatively vacate the injunction prohibiting the possession and use of the data. Unless there are further questions, I'll submit on the briefs. Thank you. Good morning, Your Honors. Timothy Presso for the Apelles. You know, my colleagues have used the word extraordinary to describe this case, and I think we would agree with the characterization, but for very different reasons. One of the things that has not gotten into the discussion yet this morning is that the district court confronted a situation in which the Forest Service had disregarded that court's prior admonition about the timing of implementation of these projects in pushing forward with immediate authorization for this project, which violated two federal statutes. Also, it's extraordinary because Idaho rushed to complete the project in three days after permit issuance, even though the Forest Service analysis had told the public this would play out over five days over a three-month period. Well, but Idaho got their permit, and once they got their permit effective immediately, they're free to take off, I think. So opposing counsel for the Forest Service says you didn't seek a TRO. Could you speak to that? Yes. We filed the lawsuit on the same day we received the signed permit, so we knew there was final agency action. Is that the first day you could have sued? That's the first day that we had a final agency action that we could. Right. So that's January 6th or 7th? We didn't receive the permit until the 7th. Apparently it was signed sometime on the 6th, but we didn't receive it. And you filed on the 7th? We filed on the 7th. The same day you got the permit? That's correct. All right. We got it about 11 in the morning, and we filed by the end of business day on that Thursday. Did you seek a TRO at that time? We did not, Judge Bea. And the reason we did not was, well, twofold. First of all, it's not our general practice to come barreling into the district court with a TRO if there's an opportunity to avoid disrupting the district court's docket. And so we reached out to opposing counsel and said, will you agree to stay in the implementation of this for a short period so that we could have a more orderly preliminary injunction proceeding? They said no. That was at the end of the day on Friday. On Sunday we had a TRO motion with materials ready to file so it would be on the district court's desk the next Monday, and they completed the project before that could happen. I'd also point out that this was a project about helicopter landings throughout a 2-million-acre area and our standing depended on having certain members in certain locations and their trips were timed to specific periods during the winter. And until we knew when the permit was signed, when the helicopter flights would happen, we were unable to determine exactly, you know, which standing declarants would be in the right place at the right time to prove up our Article III right to be in the courthouse. And so that was another thing that couldn't just be in the can ready to go on the day that we got the permit. But I also think it's extraordinary to suggest that a 24-hour period of, you know, the court's business day after finding the complaint is too long to wait, especially when the district court had previously given the Forest Service an admonition to say, you're on notice, that I'm really concerned about this activity, and I would expect you to allow time for a legal challenge to play out before you allow implementation again. Your complaint had a NEPA claim and a Wilderness Act claim, and it only sued the Forest Service initially. Correct. And then you amended the complaint and you added Idaho. Yes. What claims are you bringing against Idaho? Well, we're not saying that Idaho is directly an actionable defendant under NEPA or the Wilderness Act, but what we are saying is that Idaho's presence was necessary to effectuate complete relief because Idaho had the data as the beneficiary of the illegal permit by the time the court could act. And, you know, we've cited this court's fund for animals decision where this court recognized that in that situation where the federal agency is essentially the gatekeeper for a state to carry out action, that the state may legitimately be enjoined. The state wasn't enjoined in the fund for animals, right? But that cites, I think, Heckler. And I don't know if that's the theory you're relying upon or if you're relying upon the ‑‑ there's a colloquy in the record about the federal government needing access for a service, forgive me, needing access to this data also in order to maintain, really conduct, satisfy its obligations in the wilderness as well. But I'm having a hard time understanding your claim against Idaho. Our claim against Idaho, Your Honor, is that Idaho, in order to maintain the primacy of federal law and to avoid totally nullifying the federal remedy for a violation of federal law, Idaho has to be subject to the court's injunctive power. And it's not just fund for animals, which you're right, Your Honor, that was a statement that wasn't applied in that case. This is a principle that's been recognized in other circuits as well. We've cited to you, I think, two other federal court of appeals cases. There's also a case from the Fourth Circuit, South Carolina Wildlife Federation versus Limehouse, which goes down the same track. And I think what all these appellate court decisions recognize is in a situation like this where the state is essentially receiving the benefit from an illegal authorization issued by the federal government, the supremacy clause and the rights conferred by Congress will be nullified unless there's a way to reach the state so that it can't just render the violation a fait accompli. I think you've answered my question about the other line of cases. I appreciate that. Okay. I'll just say that a couple of points I want to address that came up in the discussion the court had with opposing counsel. Judge Bea referenced the Forest Service Counsel's argument about Vermont Yankee as being perhaps somewhat more persuasive. I want to address that. Vermont Yankee says that the courts cannot hold an agency action to be unlawful based upon violation of a procedure that the courts deem appropriate. That's about determining the illegality of agency action. In Vermont Yankee, the trial court decided to impose a hearing requirement on the Atomic Energy Commission, right? Right. But here, what the court did, what Judge Windmill did, was impose a 90-day rule. Isn't that for Congress to decide? I think, Your Honor, the key distinction is we're in a remedial context here, not the determination of whether the agency violated the law in the first instance. We're in a situation where it's been determined the agency violated the law. The appellants do not contest that. They violated the law, and the district court was fashioning a remedy to address that, and that's not what Vermont Yankee addressed. And this Court has, in numerous cases, affirmed injunctions that did include procedural, new procedural requirements for an agency in this remedial context. We've cited a couple of those cases for you in our brief. There's another one I would point out to the Court, a case that is also cited in our brief, but for a different principle, which is the High Sierra Hikers decision, in which this Court imposed specific environmental analysis procedures on the agency in the remedial context because it deemed those absolutely necessary in order to ensure that federal law was honored, and that's what Judge Windmill was doing here. So, Judge Windmill, and the briefing almost skips over this. It's unusual because you all go straight to the remedy, but there isn't any challenge to his finding that I think both statutes were violated. Is that right? So he was trying to fashion some kind of a response. That is absolutely right, Your Honor. We're here before you this morning in a situation where the appellants do not contest that the NEPA was violated and the Wilderness Act was violated. They're just here to tell you that the federal courts can't do anything about it. Well, okay, but you're going to have to explain to us, if you could, why these were the appropriate remedies because this is an oddball case. It is, Your Honor. I appreciate the problem that he's finding two violations and nobody disputes that both statutes are violated, and so he was trying to fashion a remedy. Why was it correct for him to impose the 90-day delay? Is the NEPA violation the avoidance of accumulative effects, or what exactly was the NEPA violation? What's he trying to cure? The NEPA violation was failure to prepare an environmental impact statement before launching this unprecedented 120 helicopter landings in a flagship federal wilderness area. What's 90 days get you? So what 90 days gets you is an assurance that we're not going to see the one of the things that the district court was really concerned about was the issue of cumulative impacts, as Your Honor suggests, because year after year with these motorized intrusions, the conditions that Congress was trying to ensure would be honored in this area are going to be degraded. Well, or not. But it seems to me that you could certainly get into court and lose on all of this. I mean, I've made it pretty clear to opposing counsel, and I'll give you a chance to respond, of course. I think all he did was say next time before you issue a permit, you have to give them a chance to challenge it. 90 days sounds like a long time to me. Well, the key point I think the judge was concerned about is what he didn't want to see was that these cumulative impacts become a fait accompli by virtue of the fact that they would play out repeatedly over a short term before the federal courts could get involved, and he had seen that happen twice at the time he acted. Okay. So then what about the other injunctive relief, please, about the data? How does that remedy the problem? He's got two problems. One is a helicopter permit that didn't authorize or contemplate wolf collarings at all, right? Absolutely. But as to your team, sorry, the Forest Service, he ordered that they couldn't use the data, and as to IDO, they couldn't use and must destroy. Could you speak to that, please? Yes. So first, as to the wolf data, as the court has pointed out, IDO had no authorization to gather that wolf data at all. They violated their permit in gathering the wolf data. Right, but they issued a notice of noncompliance. A notice of noncompliance that had no prohibitive effect on Idaho. Idaho has a plan in place to kill 60% of the wolf population in the Middle Fork area of the wilderness in order to inflate the elk population. Idaho claims unilateral authority to take that action without any need for Forest Service approval or participation. Idaho failed and refused to disavow that it would take that action as a condition of working out some kind of agreement in this case. Idaho said, we don't have anything planned right now. Idaho said, it may not be likely we would have done that, but what Idaho never said is simply, we won't do that. They could have easily have made that statement. They declined to do so. So the district court was very concerned that there would be further harm to the wilderness through the killing of the wolves and their pack mates as a result of this. You don't dispute that Idaho can do that as long as they don't use federal helicopters to go in the area. We dispute that the Forest Service can stand by and let them do that, but that's not the issue that was before the court in this case. What was before the court in this case was that Idaho now had an increased capacity to effectuate that result by virtue of the federal law violation that had become a fait accompli because of the way the defendants carried this out. The Forest Service's argument is that that's speculative, what they're going to do with the data, or perhaps even that it's not right, that you should be required to wait until the next time Idaho applies for a permit. What about that? Well, first of all, I would say given that they stand by their plan, which puts the state on record as saying we want to kill 60 percent of the wolves in the middle of this area, I don't think it's speculative. They have never disavowed it. But last... Wait a minute. We're not talking about killing wolves at this point. We're talking about the next permit application to go into collar wolves. Yeah. They don't... Am I misunderstanding? That seems to me to be the question. I don't think that it is the question, Your Honor. I think the question is whether they would now turn around and use that data, which gives them the locational coordinates on three wolf packs, to effectuate their plan to kill the wolves in the wilderness. I mean, it's a 2.3 million-acre wilderness, and they've said how hard it is to locate wolves. Now they have this body of data that says here's the territories of three wolf packs, where they go at different times of the year. It's obviously a big leg up on carrying out that plan. I'd accept that. And you make this point repeatedly in your briefing. But I think what Judge Wimmel talked about instead was them using the data to get the next permit. I don't think he talked about them using the data to kill wolves. He did. He talked about the concern about them using the data to track wolves. But I think what Your Honor is getting to is the issue of the elk data. And I want to come to that. But before I close out on the wolves, I just want to say, this idea that there's going to be a further permit proceeding regarding the wolf data is not what Idaho has ever suggested. They've said we can do this with... Not only we can, but we will, as we choose, do this on federal lands, in the middle of the wilderness, without the Forest Service involvement. As to the elk data, the district court's decisions repeatedly make the finding, which is borne out by the appellant's own statements in the record, that this data is only useful to the agencies if they get more of it. That's why this was initially crafted as a 10-year project, and then when it turned out that that was going to involve the Forest Service in a more prolonged process, they sliced it down into a one-year increment in order to get it approved quickly so that they could get it across the finish line in the time that Idaho was insisting that it had to happen, or else Idaho was going to fly the helicopters unilaterally without Forest Service approval. And that is in the record. The counsel for Idaho referenced that as, I think he said, posturing. But what we see is that the regional planning director for the Forest Service said, they're going to fly helicopters whether we give them a permit or not. We want to avoid that train wreck if we can, so let's get this out as quickly as possible. So there was a real concern that, number one, Idaho wants more data. Number two, Idaho is going to fly more helicopters in the wilderness. And number three, Idaho is going to do this whether the Forest Service gives them a permit or not. And in that circumstance, the judge, I think as Your Honor has said and anticipated, was concerned that this impact on wilderness character that Congress acted to preserve would play out before the parties could ever get into the courthouse, as it already had twice. And that's why he imposed this order as to the elk data as well as the wolf data, so that the data they had already gotten through a federal law violation wouldn't become the driving force for still more motorized incursions that would further degrade the wilderness through these cumulative incursions. When you said it had already played out twice, you're not referring to the 2010 incident? Yes. You are referring to the 2010 incident? Yes. The 2010 incident involved helicopter landings for the purpose of collaring wolves. At that time, the district court said, that's okay because wolves are so important to wilderness character that it's important for Idaho to be able to study them. Right. So Idaho wasn't acting in violation of a court order. Well, you're right that the government prevailed in that case, but the thing that did happen in that case was the helicopter landings played out before the court could fully adjudicate the challenge to those authorizations. And that was sort of the backdrop that caused Judge Winmill to say, I'm really disturbed by that because everyone ought to have a chance to litigate this fully before it happens again. That's why Forest Service, you're on notice that I'm very concerned about this, and before you do it again, you need to provide time for people to have a chance to get in the courthouse. Correct me if I'm wrong, the Forest Service gave you notice of their final ruling as to the use of the helicopter license, right? Yes. You could at that point have filed for a TRO, but you didn't because you were trying to negotiate something with Forest Service. Theoretically, we could have if we could have gotten all of our standing declarants lined up in order to know exactly when they were going to be in the wilderness and where in relation to helicopter landing in a 24-hour. Your allegations could have been on information and belief. All our people are going to be there all of the time. Well, but, Your Honor, again, 2.3 million acres is what's at issue, and it's wintertime, and their trips into the wilderness are dependent on weather and the geography where they're going to be present in the wilderness. We had to also make sure they're going to be in the place where the helicopters are supposed to occur at the time they were supposed to happen. I think I've got my answer. I mean, I guess I'd just say, Your Honor, I think it's extraordinary to suggest, I've never heard the Forest Service say before, that what we should be doing is blasting into court with a temporary restraining order motion that tries to restrain the government's actions without ever reaching out to government counsel and saying can we work something out for a more orderly procedure. It's done all the time in immigration cases where the immigrant is at the airport. But, Your Honor, I would suggest to you that it's perhaps not in a situation where a district court has previously said, Forest Service, you must give time for these challenges to play out. And I don't think it was in any way negligent of us to try to avail ourselves, remind the Forest Service that that had been imposed upon them, and ask them to honor it, which they declined to do. Had you filed the TRO on Friday, you would have had to get the order, the permit on Friday, file the complainant TRO on Friday, and get a ruling on Friday in order to stop the helicopter. We got the permit on Thursday. We had to file the TRO on Friday and get a ruling on Friday to stop it before it was done over the weekend. Thank you. Okay. Just a couple of additional points. Counsel for Idaho says, well, the radio callers are not operational at this point, so no problem. That's very cold comfort. Whether they continue to send a live signal, Idaho has this compilation of data about the locations of three wolf packs in the wilderness. And that information remains useful to go out and track those packs and kill the wolves. Idaho also invokes the 11th Amendment and says, well, you can't interfere with our use of property. This is state property. But the problem with that is what they ignore is the genesis of every piece of data in their position, in their possession, excuse me, is a violation of two federal statutes. All of the data is in their hands only because federal law was violated. That is not the case in the Coeur d'Alene tribe decision, Idaho versus Coeur d'Alene tribe from the Supreme Court, that they invoke as an effort to shield themselves with the 11th Amendment. That was about the interference with state regulatory authority over submerged lands that had been part of the state's territory since statehood. Here we're talking about data that they only came by as a result of a violation of two federal statutes. It's a very different situation. I think it would be, I think I would suggest the court should consider the implications of a rule that says that where a state is the beneficiary of a federal law violation, but essentially gets away with it before the federal courts can act, that the federal courts have no power at that point to enforce the supremacy clause and the statutes that Congress has enacted. I would hope that that would be of concern to the court. I guess the last point I'll make is this was a course of conduct that I personally, I've certainly not seen before in litigating in this area of the law for nearly two decades where an agency disregards an admonition of a federal district court, a state implements in what the district court said gave him grave concerns, was an intentional ploy to evade review. I've never seen that kind of strong language before used in this kind of, against these kinds of agencies. And last, the state violates its permit that in this really critical area that Congress has set aside for special treatment. It is an extraordinary case. That's why the district court issued a remedy that this court doesn't see every day, but it's also why it's appropriate to affirm that remedy. Thank you for your time this morning. Thank you. I have five quick points that I would like to make. First, if the district court was concerned that Idaho needed to apply for a permit and wanted to address that question that it was concerned permeated past disputes, it could have simply ruled that a permit was required in the future, was required, that Idaho couldn't get out of it by not applying for a permit and then also found that this permit was invalid. And that decision would have been persuasive authority for both agencies going forward. That wasn't briefed or litigated before him, though, was it? No, but this is in response to some of the questions that came up. What if the district court was just concerned about this longstanding dispute? That is what the district court could have done. It could have simply set aside the agency decision here and passed on the question of whether a permit was required. Also, it would not have been appropriate for the district court to require the Forest Service to prepare an environmental impact statement here that would directly contravene Monsanto. Third, even if you accept that the wolf data could be used to kill wolves, as the plaintiffs have alleged, then that fact wouldn't justify the injunction here against the wolf data because the injunction would still not be narrowly tailored. The district court could have said, Idaho, you cannot use the wolf data to kill wolves, but you can use it for other scientific purposes. But I don't want to get bogged down in the wolf data. The problem that the Forest Service has with the injunction is primarily with the data component of the injunction is primarily with the elk data. All of the harms that plaintiffs have alleged concerning the wolf data don't justify any injunction prohibiting the use of the elk data or ordering the destruction of the elk data. The plaintiffs say that they fear additional helicopter landings will be authorized in the future, but the plaintiffs will have an opportunity to challenge those authorizations if they ever occur, and that would be the appropriate time for the court to decide whether an injunction is appropriate. Finally, the cases cited by my friend on the Alaska Center and the National Wildlife Federation case in an effort to distinguish Vermont Yankee are not applicable here because those cases concerned the scope of the district court's authority over a remand to the agency that the district court retained jurisdiction over. Here, the 90-day implementation delay was open-ended. It wasn't just limited to the next permit. It applies to all wildlife management helicopter permits that the agency might issue into the future, decades to come, and that injunction is an abuse of discretion in this limited case and controversy that requires its reversal. When you sought reconsideration on that injunctive relief, you only asked him to clarify that emergency vehicles could be used. That's correct. We didn't ask for reconsideration on the other issues because we wanted to focus on the narrow issue, and we didn't think that we would have success on that matter. We preserved that issue for appeal. Okay. I'm going to impose on my colleagues because I didn't quite understand your last point, why Vermont Yankee, you take the position Vermont Yankee is applicable here. Yes. And your learned friend takes the position that Vermont Yankee dealt with the validity of the agency action rather than a remedial basis for a determined violation. Now, you cited Alaska Center. Tell me again slowly so that I get it right. What is your point? Mr. Presser relies on Alaska Center for the idea that a district court can impose procedural requirements on an agency going forward. Our argument is that that case, Alaska Center, is distinguishable from the case here because in Alaska Center and in the National Wildlife Federation case, the district court retained a jurisdiction over the remand to the agency. Here, the district court hasn't retained a jurisdiction. The Alaska Center case is also distinguishable because that involved a citizen suit claim. Why do you say that Judge Windmill hasn't retained jurisdiction if he's put in an injunction that you need to give 90 days' notice? If you don't give 90 days' notice and we uphold that, he certainly has jurisdiction to hold you content. Well, in those cases, the district court retained jurisdiction over the remand to the agency that required the agency to take proactive steps to issue a new agency decision. Here, there's no pending agency decision that has been remanded to the agency to redo. Well, he's anticipating the next permit application, though, and that was certainly the original plan is that there would be a series of them, and Judge Windmill has said these cases should be brought back to him. So what are we really missing? Well, the problem with that understanding of Judge Windmill's decision is that it would violate Monsanto, which specifically held that courts should not issue injunctions as prophylactic measures. They can't use one case to retain jurisdiction over all future types of agency actions that might be litigated. The Vermont Yankee principle is not so limited to situations where a court might hold an agency action invalid. If you read the full decision, it talks about— So do you think Judge Windmill had no ability to fashion a remedy here? That's what I just—that's what opposing counsel has released, how he's characterizing your argument. Is that unfair? I think it's possible that Judge Windmill could have fashioned some kind of a remedy here, but not the remedy that was ordered. What kind of remedy do you think would have been available under your reading of the law? What's left? I hesitate to speculate on what else Mr. Presto's clients might have asked for, but, for example, if they had asked for declaratory judgment, maybe that would have been an option. If they had asked for a more—I mean, if you—the transcript for the summary judgment hearing shows that Mr. Presto actually asked for the injunction to be limited until the agency issued a new environmental analysis about— But it cannot be the case, unless TRO and NEPA is all about procedure and process, and you're really anticipating that Judge Windmill would have required a TRO to be filed on Friday. What district court judge would do that, rather than trying to get an orderly process in place? Again, I have not found a single case in which a judge has entered this kind of an injunction. We don't often see a state taking the position that it can enter a wilderness and do as it pleases. This is a pretty exceptional record. That's fair. This case is unusual in a lot of respects. But I would say—what I would also say, though, is that in district court, the plaintiffs actually didn't even ask for this 90-day delay. They simply pointed out the fact that there was very little time in between the issuance of the permit and the action being completed as justification for their other remedies. So this relief wasn't even something that the plaintiffs were asking for. Would the Forest Service be agreeable to our finding that Judge Windmill abused its discretion in prescribing 90 days, but a 10-day period would be all right? We would also object to that because it would still violate the same legal principles that courts aren't free to impose procedural remedies. What we can do, though, is we can agree to provide the plaintiffs with notice, as much advance notice of future helicopter permits when they will be issued so that the plaintiffs can get all of their documents in order. That's what happened here. They had notice. They had notice. They got the permit. That's true, but that notice— Within 24 hours. That notice isn't actually guaranteed by any statute or regulation. I'm just saying if they got it here, it didn't help. It didn't avert anything. Well, I would argue the fact that this case has been litigated fully shows that the plaintiffs did actually get their day in court. For example, if the Forest Service issues another permit in the future, another short-term permit in the future, and doesn't provide more notice than what it did here, and it goes to Judge Windmill, and Judge Windmill finds that there wasn't sufficient time for them to litigate it fully, they try to bring a TRO, the action is completed, then there might be a basis for this kind of repeated conduct to ask for something more here. But there isn't that kind of a basis here. Even setting aside the legal principles that would make this kind of an injunction improper, there certainly wasn't enough of a pattern or practice of sort of bad conduct or trying to hide the ball or trying to get the action completed to evade review that would warrant that kind of a delay. I don't think your friend would agree with you. At first it was a 10-year program, then it was a 5-year program, then it was a 1-year program, and they got the permit out right away. That's somewhat of a pattern. But we've taken you over your time, and thank you very much. Thank you. The case of Wilderness Walk v. Perdue will be submitted, and the court will stand adjourned until tomorrow morning at 9 o'clock. Thank you very much.
judges: Farris, Bea, Christen